| | | | |
|---|---|---|---|
| \_\_ | United States District Court, Northern District of Illinois | | |
| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
| **CASE NUMBER** | 97 C 2065 | **DATE** | 8/31/2001 |
| **CASE TITLE** | Guinivere Garcia vs. Gwen Thornton | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due \_\_\_\_\_.
(3) ☐ Answer brief to motion due\_\_\_\_\_. Reply to answer brief due\_\_\_\_\_.
(4) ☐ Ruling/Hearing on \_\_\_\_\_ set for \_\_\_\_\_ at \_\_\_\_\_.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on \_\_\_\_\_ set for \_\_\_\_\_ at \_\_\_\_\_.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on \_\_\_\_\_ set for \_\_\_\_\_ at \_\_\_\_\_.
(7) ☐ Trial[set for/re-set for] on \_\_\_\_\_ at \_\_\_\_\_.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to \_\_\_\_\_ at \_\_\_\_\_.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)    ☐ General Rule 21    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For all of the reasons stated above, we deny [0-1], dated 4/29/1997, the Section 2254 petition for a writ of habeas corpus brought by petitioner Gwen Thornton. This is a final and appealable order.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 0 4 2001 | |
| | Notified counsel by telephone. | date docketed | 27 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| TSA | courtroom deputy's initials | FILED FOR DOCKETING  01 AUG 35 AM 8:07  Date/time received in central Clerk's Office | date mailed notice  mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GUINIVERE GARCIA, | ) |
| Petitioner, | ) |
| v. | ) No. 97 C 2065 |
| GWEN V. THORNTON, Warden, | ) Wayne R. Andersen |
| Durgent Correctional Center, | ) District Court Judge |
| Respondent. | ) |

DOCKETED
SEP - 4 2001

## MEMORANDUM, OPINION AND ORDER

Guinevere Garcia was convicted of first degree murder, as well as unlawful use of a firearm by a felon. The Illinois Supreme Court affirmed her conviction. This case is before us on the petition of Guinevere Garcia for a writ of habeas corpus pursuant to Title 28, United States Code, Section 2254. For the reasons stated below, we deny Garcia's petition.

## BACKGROUND

Garcia does not challenge the statement of facts set forth in the order of the Illinois Supreme Court. People v. Garcia, 165 Ill.2d 409, 651 N.E.2d 100 (1995). In that appeal, Garcia challenged both her underlying conviction for the murder of her husband, George, but also her death sentence. The Supreme Court of Illinois affirmed Garcia's conviction and sentence, although two justices dissented concerning Garcia's eligibility for a death sentence. Ultimately, then Governor Jim Edgar commuted Garcia's sentence to life imprisonment.

For purposes of federal habeas review, " a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e). Accordingly, we find the

facts are as follows. After her March 1991 release from prison following a conviction for the murder of her eleven month old daughter and several aggravated arsons, Garcia met and married George Garcia (the victim). Garcia met her husband while working as a prostitute. She lived with him for several weeks in Bensenville and then left him to live with her grandparents in Chicago. She then began a relationship with John Gonzalez, a security guard with the Chicago Housing Authority.

On July 22, 1991, Garcia was at her grandparents' house drinking alcohol on the porch with her uncle, an ex-boyfriend, and her new boyfriend, John Gonzalez. On July 23, 1991, at 12:15 a.m., Garcia and Gonzalez left her residence and headed towards Gonzalez' place of work. When they discovered that Gonzalez was too late for his shift, they went to Garcia's bank and attempted unsuccessfully to obtain money. Garcia then told Gonzalez that she knew where they could get some money and told him to drive to Bensenville. She did not tell him where they were headed or whom she intended to see about the money. In fact, Garcia was headed to her husband's residence.

When they arrived at her husband's apartment building, Garcia saw him and greeted him. She then grabbed Gonzalez' gun (which was between them in the front seat of Gonzalez' car), got out of the car and forced her husband into his pick-up truck. After an argument and struggle for control of the gun, Garcia shot her husband at point-blank range in the chest. He fell out of the truck to the pavement and bled to death. Gonzalez, who testified to these events, said that the entire incident in the truck lasted about 30 seconds. When Garcia returned to Gonzalez' car, she told him "That m----erf—er deserves to die."

Garcia then drove Gonzalez car back to Chicago, discarding the empty shell casing along

2

the way. When she arrived at her home (at approximately 3:39 a.m.), she began calling her husband's residence and leaving messages on his answering machine professing her love for him. After the Bensenville police department learned of the murder, Garcia and Gonzalez went to the police department voluntarily to answer questions. Prior to going to the police station, Garcia consumed approximately four beers. While she was interviewed, she repeatedly told the police that she wanted to get the person responsible for her husband's death. Earlier, she had also told her uncle that she thought her new boyfriend, Gonzalez, had killed the victim. Garcia stayed at the police station from 8:15 a.m. until 12:30 a.m.

After leaving the police station, Gonzalez and Garcia headed home to Chicago. During the ride home, Garcia drank a couple more beers. The two then headed to a bar to have some more drinks. After about an hour, Garcia telephoned the police and told them that Gonzalez had killed her husband. The Bensenville police arrived at the bar at about 4:30 p.m and took Garcia and Gonzalez into custody. Both were read their Miranda rights, but the police told Garcia that she was not really under arrest, but that she should go along with this procedure for Gonzalez' sake.

At 6:00 p.m., the police read Garcia her Miranda rights again. She signed a card that stated she understood her rights. She then gave the police handwritten and tape-recorded confessions during which she stated that Gonzalez killed her husband. In a separate room, Gonzalez told the police that Garcia had actually killed her husband. At 10:30 p.m., the police told Garcia that she was under arrest for the murder of her husband, George Garcia. She was once again read her Miranda rights and then gave a written confession that it was she and not Gonzalez who had murdered her husband. It is undisputed that Garcia was not under arrest until

3

that time.

Several hours later, Officer Neuberg processed Garcia at the Bensenville police station. Because Garcia was shaking, the police officer had trouble fingerprinting her. He asked her why she was shaking. She responded that she had just killed her husband. He then asked her what kind of gun she had used and where she obtained it. Garcia responded that the gun was a .357 Magnum and that she had gotten it from a friend.

Garcia unsuccessfully moved to suppress her statements and confession and that motion was denied by the trial court. At her trial, Garcia waived her right to have a jury impose her sentence. The trial court, over Garcia's objection allowed her seven peremptory challenges instead of fourteen. However, Garcia did not use all of the seven challenges allotted to her.

During the trial, Garcia requested that she be allowed to testify about the conversation she and her husband had before she shot him to death to prove that she killed him while under a sudden and intense passion resulting from an intense provocation. Garcia was permitted to testify to what she said to her husband during this conversation and about their altercation over the gun, but she was not permitted to testify about what her husband said on hearsay grounds.

When the court instructed the jury, it gave an instruction which accurately set forth the elements of first degree and second degree murder, as well as for involuntary manslaughter. The court refused to give Garcia's proffered instruction (a non-Illinois pattern jury instruction) which stated that a voluntary act is a material element of every offense.

The jury convicted Garcia of first degree murder and unlawful use of a firearm by a felon on September 14, 1992. An eligibility and sentencing hearing took place on October 7, 1992. A victim of one of Garcia's previous crimes testified that she had robbed him at gunpoint and had

4

pistol-whipped him. (Garcia received probation for this offense.) In addition, the investigating police officer testified that Garcia had admitted in a transcribed confession to committing four aggravated arsons and to murdering her eleven month child. (She originally claimed the child had suffocated herself with a plastic bag.) In mitigation, Garcia presented evidence that demonstrated that she was suffering from alcoholism, depression and borderline personality disorder. She also presented evidence that she had been sexually abused as a small child through her teen age years by several family members.

The court, after reviewing this transcript and the other information, sentenced Garcia to death. Two justices disagreed with this sentence. They pointed to Garcia's horrible history of sexual abuse and abandonment. They also relied on evidence that Garcia had killed her child because she believed that her grandparents would try to take the child away from Garcia and Garcia set the fires on the anniversary of the child's birth and death. In addition, there was evidence that Garcia's husband (the victim) had physically abused her. On the day of the murder, Garcia had been drinking all day and had spent part of the day with one of the uncles who had abused her, which resulted in a violent argument. Further, a psychiatric witness had testified that although Garcia was not insane, she was suffering from a mental disorder that would affect her judgment significantly. For these reasons, the two justices dissented. Later, on January 17, 1996, Governor Edgar commuted her sentence and she is instead serving a mandatory life imprisonment.

Garcia's petition for writ of habeas corpus raises five specific claims: (1) the trial court erred in failing to give Garcia's tendered jury instruction that "a voluntary act is a material element of every offense"; (2) the trial court erred when it precluded Garcia from testifying about

5

her husband's statements to her; (3) the trial court erred when it failed to suppress incriminating statements that Garcia made during her booking procedure; (4) the trial court erred when it failed to suppress Garcia's confession because she was too intoxicated to knowingly and intelligently waive her rights; and (5) the trial court failed to give Garcia fourteen peremptory strikes.

Garcia's death sentence was stayed while she appealed directly to the Supreme Court of Illinois. On March 23, 1995, the Illinois Supreme Court affirmed Garcia's convictions and death sentence and further denied her petition for a rehearing on May 30, 1995. On June 5, 1995, Garcia announced her intention to waive further challenges to her death sentence. On November 2, 1995, the Illinois Supreme Court, after hearings, found that Garcia was competent to waive any such challenges and set January 17, 1996 as the date for her execution. However, as noted above, Governor Edgar commuted her death sentence. As a result of her decision not to further challenge her death sentence, Garcia never filed a post-conviction appeal in the state court.

## DISCUSSION

Title 28, United States Code, Section 2254(d) governs the consideration of any claim adjudicated by a state court on its merits. Under that statute, we may grant habeas relief only if the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." § 2255(d)(1). Under subsection (d)(2), habeas relief is possible only if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in the state court.

The Supreme Court, in Williams v. Taylor, 529 U.S. 362 (2000), attempted to clarify the applicable standard of review within the meaning of the AEDPA. The Court noted that the test

6

of the AEDPA does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. Id. at 385. Recognizing the need for further clarification and direction to lower courts, the Supreme Court concluded that the "AEDPA plainly sought to ensure a level of "deference to the determinations of state courts," as long as those decisions do not conflict with federal law or apply federal law in an unreasonable way." Id. at 376. Additionally, the Supreme Court determined that in passing the AEDPA, "Congress wished to curb delays, to prevent "retrials" on federal habeas petitions and to give effect to state convictions to the extent possible under the law. When federal courts are able to fulfill these goals within the bounds of the law, AEDPA instructs them to do so." Id. at 376. Therefore, this court is directed to apply a deferential review of the state court decision unless it is determined that the state court violated federal law.

Applying this standard to petitioner's claims, we must deny them. Petitioner's first claim is that the trial court erred when it failed to give petitioner's proposed jury instruction that "a voluntary act is a material element of every offense." She argues that the failure to give this instruction meant that the jury was forced to convict her even if they concluded that the shooting was accidental. The state court addressed this claim fully and rejected it. Petitioner fails to establish how its conclusion was either contrary to, or an unreasonable application of federal law. Nor do we see how petitioner's claim meets this standard. The court appropriately instructed the jury fully as to the requirements of first degree murder. It further instructed the jury that the state had to prove all of the elements of this crime beyond a reasonable doubt. If the jury concluded that she had committed this crime, they were further instructed to decide whether petitioner's actions were the result of sudden and intense passion coupled with a serious provocation. If the

jurors reached this conclusion, the court instructed them to convict petitioner of second degree murder. Finally, and significantly, the jury was given the definition of involuntary manslaughter and told that an accidental firing of the gun was not sufficient to constitute "recklessness" as that term was used in the definition.

We agree with the Illinois Supreme Court that petitioner's proposed instruction in light of the other jury instructions given was at best redundant or "an inverted way of instructing the jury as to the elements of first degree murder and that the State had the burden of proving that these elements exist[ed] beyond a reasonable doubt." Garcia, 65 Ill. 2d at 434, 651 N.E. 2d at 112. Therefore, we reject petitioner's claim.

Petitioner secondly argues that the trial court's failure to permit her to testify about the decedent's statements to her to demonstrate his state of mind deprived her of a fair trial. We agree with the state court that the trial court should have permitted this testimony under the state of mind exception to the hearsay rule. The proffered testimony was that the decedent was urging petitioner to move back in with him. However, the Supreme Court ruled as a matter of state law that even had the proffered statements been admitted and believed, they would not have risen to the level of provocation under state law to exonerate her actions. As the state decision sets out, Illinois precedent clearly provides that threats to kill the defendant are insufficient to constitute legal provocation. People v. Tenner, 157 Ill. 2d 341, 371 (1993). The testimony here amounts to far less than a threat to kill. Petitioner has not offered any argument why the Illinois court's interpretation of Illinois law is contrary to federal law or is unreasonable in light of the evidence presented at trial.

Petitioner's third claim is that the trial court should have suppressed incriminating

8

statements she made during booking procedures. The Illinois Supreme Court held that the booking officer's question "why are you shaking?" while attempting to fingerprint petitioner was not interrogation and, therefore, that her response to the effect that she had just killed her husband was properly admitted. As the court properly found, "interrogation" for <u>Miranda</u> purposes is defined as "any words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). The court noted that the context of the question was that the booking officer was attempting to fingerprint petitioner and that her physical shaking was making that process difficult. His question, therefore, was an awkward attempt to ascertain what might be done to halt petitioner's shaking. We note that petitioner's response is not one which a police officer would expect to be the rejoinder to his simple inquiry.

However, after petitioner made this statement, the officer's follow up question, which asked what kind of gun was used in the crime, clearly constituted an attempt to interrogate petitioner and to elicit an incriminating response. The Supreme Court of Illinois so held, but went on to find that the <u>Miranda</u> warnings that petitioner earlier had received were sufficient to safeguard her Fifth Amendment rights. We agree. The time period between the booking and the rights was fairly short, two and a half hours, and the warnings could hardly be considered stale, especially given petitioner's extensive prior experience with the police. We cannot find that this decision is contrary to existing federal law or unreasonable.

Petitioner also challenges the constitutional sufficiency of her prior <u>Miranda</u> warnings, claiming that she was too intoxicated to voluntarily waive them. The trial court found that the totality of the relevant circumstances, including the fact that her tape-recorded statement was

9

coherent and easily understood, demonstrated that the waiver of rights was knowing and voluntary. The Illinois Supreme Court affirmed this ruling. We find nothing in the record before us to show that this finding was contrary to federal law or an unreasonable interpretation of the facts before the trial court.

Petitioner's final argument is that the trial court should have given her fourteen peremptory challenges instead of only seven and that the failure to do so violated her due process rights. Illinois Supreme Court Rule 434 (d) requires fourteen challenges in capital cases. Respondent maintains that petitioner has procedurally defaulted this issue because the state decided it pursuant to an independent and adequate state law ground. Coleman v. Thompson, 501 U.S. 722, 750 (1990). Respondent argues that the state court ruled that petitioner had waived her right to challenge this on appeal because she had not objected during the trial. Although it did note that petitioner had failed to preserve this issue for appeal, the Illinois Supreme Court also stated that it "need not reach the merits of defendant's peremptory challenge argument, however, because defendant suffered no prejudice as a result of the trial court's ruling. Notwithstanding that defendant was afforded seven, as opposed to fourteen, peremptory challenges, defendant did not exhaust her peremptory challenges during jury selection." 165 Ill.2d 409, 427. Therefore, she could hardly argue that she was prejudiced by receiving additional challenges that she clearly would not have used anyway.

Although the Illinois Supreme Court stated that it was not ruling on the merits of petitioner's argument, it did more than state that she had waived the claim. It went on to hold that she could not have been prejudiced by the court's action—which does address the merits of petitioner's argument before this court. We do not agree, then, that petitioner had procedurally

10

defaulted this claim.

Having said that, we do not find that petitioner has demonstrated that she is entitled to habeas relief based on this argument. Swain v. Alabama holds that a trial court's impairment of a defendant's right to peremptory challenges is not unconstitutional unless there is a showing of prejudice. 380 U.S. 202 (1965). The record before us demonstrates that petitioner, who failed to avail herself of all fourteen of the challenges allowed, was not prejudiced by the trial court's ruling. Therefore, she cannot establish that her constitutional rights were violated.

## CONCLUSION

For all of the reasons stated above, we deny the § 2254 petition for a writ of habeas corpus brought by petitioner Gwen Thornton. This is a final and appealable order.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: August 31, 2001